## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 22-cr-338 (DLF)** |
| **TRACI ISAACS** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Traci Isaacs to 18 months' incarceration, 36 months' supervised release, $2,000 in restitution, and a $100 special assessment. The government's recommended sentence is at the midpoint of the 15 to 21 month Guidelines range to which the parties stipulated in the guilty plea agreement and calculated by the United States Probation Office in the Presentence Investigation Report ("PSR"). An 18-month sentence reflects the gravity of Isaacs's conduct, but also acknowledges her early admission of guilt.

### I.    INTRODUCTION

The defendant, Traci Isaacs, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in

losses.[1]

Prior to January 6, Traci Isaacs, a former first responder and member of the Oath Keepers, participated in a group "Signal" chat with other members of the Florida Oath Keepers that discussed preparations for January 6—including preparations for violence. Isaacs encouraged others, including her nephew, William Isaacs, to join Oath Keepers, and encouraged him to "work security" during January 6. On that day, Isaacs, along with her partner, Luis Hallon, and friend, Leslie Gray, entered the Capitol through the East Rotunda Doors and took photographs while inside. Isaacs' nephew William also breached the Capitol through the same doors although at a different time. For almost three weeks afterward, Isaacs obstructed the FBI's investigation into her criminal activity on January 6 by deleting text messages and photos and encouraging others to do the same.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 34, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

**B.**     **Traci Isaacs's Role in the January 6, 2021 Attack on the Capitol**

Traci Isaacs lives in St. Cloud, Florida. On January 4, 2021, Isaacs left her home in Florida and traveled to Washington, D.C. with Hallon, William Isaacs, and Leslie Gray.

As mentioned above, Isaacs was a member of a group called the Oath Keepers. She encouraged her nephew William to join the group and to travel to D.C. for the events of January 6. On December 23, Defendant Isaacs sent William a message telling him she had paid for their hotel room in D.C. and asking him if he was excited. He responded, "Yes," and then further stated, "Either [T]rump crosses the Rubicon or the citizens cross the delaware." Ten minutes later, Defendant Isaacs' responded with this image:



On January 6, 2021, and in the days prior and following, Isaacs participated in a Signal group chat titled "OK FL DC OP Jan 6" with other Oath Keeper members, communicating under the username "Shelby Cobra" about the events at the U.S. Capitol on January 6, 2021. A few days prior to January 6, 2021, Isaacs submitted an application to volunteer with Oath Keepers at

events in Washington, D.C. on January 6, 2021.

On January 5, 2021, after arriving in D.C., Isaacs and her nephew William Isaacs tried to connect with other members of the Oath Keepers and posted a picture of herself and her nephew, the latter wearing full tactical gear. *See* Image 1, below.



*Image 1* (Isaacs with her nephew, Williams Isaacs, in a Facebook post from January 5)

On the morning of January 6, 2021, Isaacs texted, "We are gonna check in with Oath Keepers at the Capitol Building." Isaacs and Luis Hallon then proceeded to the Capitol where they joined in the protest of Congress' certification of the Electoral College outside the East Front of the Capitol. Isaacs posted a video of herself on Facebook with the caption, "storming the capitol."

Isaacs and Hallon initially joined the crowd gathered at the perimeter of the East Front of the Capitol's restricted perimeter, which was barricaded and patrolled by police officers. Isaacs chanted and yelled at the officers who had the area barricaded. After about one hour of verbal

4

abuse of the officers, Isaacs joined the group of rioters in surging forward and advancing past the barricades and up to the steps on the East Front of the Capitol. Along with the crowd, Isaacs advanced up the steps of the Capitol despite USCP officers ordering the mob to stop. Police officers physically engaged with the crowd to prevent a further surge, and Isaacs was among those who were tear gassed by the USCP on the East Front steps of the Capitol, which caused her eyes to burn. This did not deter Isaacs, who regrouped and pushed forward. At approximately 2:50 p.m., Isaacs messaged the Oath Keeper group chat on Signal that she "got tear gassed good."

Around 10 minutes later, at approximately 3:02PM, Isaacs and Hallon entered the Capitol through the Columbus Doors on the East Front which had been forced open by others despite the efforts of police. *See* Image 2 below – Isaacs circled in Red, Hallon circled in Green.



*Image 2* (Isaacs filming the riot inside the Capitol)

While inside the Capitol, Isaacs and Hallon took photographs and videos on their cellphones and walked around through the main Rotunda. *See* Images 3 and 4 below – Isaacs circled in red, Hallon circled in green.



*Image 3* (Isaacs and Hallon entering the Capitol)



*Image 4* (Isaacs and Hallon in the Capitol Rotunda)

While inside the Rotunda around 3:05PM, police officers actively worked to clear the Rotunda of the rioters with verbal orders and physical force. As seen below, Isaacs and Hallon

were only a few feet away from the officers. Despite this, they did not leave the Rotunda.



*Image 5* (Isaacs and Hallon in the Rotunda as officers enter and begin to clear the area)

Isaacs remained in the Rotunda and continued to take photos as police officers attempted to clear the crowd. During this time, Isaacs captured a photo of the statute of President Gerald Ford, as seen below. *See* Image 6.



*Image 6* (Image from Isaacs' phone of the Gerald Ford Statute)

Isaacs and Hallon left the Rotunda only when police officers forced the crowd of rioters from the room around 3:14PM. *See* Images 7 and 8 below.



*Image 7* (Isaacs remaining in the Rotunda as officers clear the area)

8



*Image 8* (Officers clearing the Rotunda)

Isaacs and Hallon finally exited through the same doors they entered the U.S. Capitol

Building through at approximately 3:16PM. *See* Images 8 and 9 below.



*Image 9* (Isaacs and Hallon exiting the Capitol through the East Columbus Doors)

Image 9

9



*Image 10* (Close up of Image 9)

Issacs' nephew William ultimately breached the Capitol with other members of the Oath

Keepers. Inside, he and about six other members of the group tried to push past riot police down

a hallway towards the Senate Chamber. When officers deployed chemical spray to repel the

crowd, William was hit in the face. Florida Oath Keepers leader Kelly Meggs later bragged to

Isaacs, "[W]e got your boy his first dose of tear gas!!"

*Isaacs's Efforts to Destroy Evidence After January 6, 2021*

A few days after the events of January 6, 2021, Isaacs became aware that she had been

reported to the FBI for her criminal conduct at the Capitol building that day. On January 9,

Isaacs texted another person, "We are probably OK but were part of the Capitol Riot and I got

reported to the FBI." Approximately one week later, on January 16, 2021, the FBI encountered

and attempted to interview Isaacs at her home in Florida relating to an investigation into the

events at the Capitol on January 6, 2021. However, beginning on January 7 and continuing through January 25, 2021, Isaacs deleted or attempted to delete from her cellphone text messages, photos, videos, and other evidence relating to January 6, instructing others to delete similar records to impede or prevent the FBI's investigation regarding the events at the Capitol on January 6, 2021.

Among the text messages Isaacs deleted, Isaacs sent messages asking, "Did you delete that video," Ex. E Isaacs Cell Phone Extraction at 16, or instructing to "Delete anything I sent you please. Feds are going after people hard." *Id*. at 8. She also texted Leslie Gray, stating, "Girl I almost had a heart attack last night. FBI keep putting up more pictures and for a second, I thought one was me…" *Id*.   Isaacs even instructed her nephew, William, about how to "get a new SIM card" for his cellphone, to which he responded, "Do I work on scrubbing evidence or do I do school." *Id*. at 7. In another deleted message, she expressed disappointment only that she didn't go further in attempting to disrupt the certification vote, stating, "It was glorious but kinda fucked up. We should have done this differently. We should have occupied the Capitol with demands."

In total, Isaacs deleted or attempted to delete over 100 text messages from her cellphone relating to the events of January 6. Isaacs also deleted her Oath Keeper "contacts" from her phone and removed from Facebook her post that included a photo of her at the Capitol around January 6, 2021.

*Isaacs FBI Interview*

On January 16, 2021, FBI agents encountered and attempted to interview Isaacs at her home in Florida relating to an investigation into the events at the Capitol on January 6. She

declined to speak with them without the presence of an attorney. On March 29, 2021, FBI agents interviewed Isaacs, in the presence of her attorney, about her conduct on January 6. During the interview, the agents asked Isaacs whether she deleted anything from her phone, to which she responded "[Y]eah, but before you contacted me. . . . I didn't touch anything after you contacted me." However, once the agents conducted a forensic search of Isaacs' phone, they discovered that she had continued to delete items from her phone related to her January 6 conduct in the days after she was initially contacted by the FBI on January 16, 2021, and at least as late as January 27, 2021. *See* Ex. E.

In addition to her misrepresentations to the FBI agents regarding her destruction of evidence, Isaacs minimized her behavior on January 6 and the extent of the violence she witnessed. Isaacs admitted to "sitting" on the steps of the Capitol when it was "peaceful" before going in, but she did not mention that she was sprayed with tear gas prior to that, despite saying just that in deleted text messages to others after January 6. Isaacs also told the FBI agents that police officers "made a hole" for her to leave the Capitol. However, Capitol CCV footage does not show any interaction between Isaacs and any police officers, nor does it show the crowd separating for Isaacs and Hallon as they leave. *See* Ex. A-D, Capitol CCV.

### III.   THE CHARGES AND PLEA AGREEMENT

On October 12, 2022, a federal grand jury returned an indictment charging Isaacs with various offenses. Isaacs was charged with Altering, Destroying, Mutilating, or Concealing a Record, Document, or Other Object in violation of 18 U.S.C. §§1512(c)(1) and 2 (Count Two); Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § § 1752(a)(1) (Count Four); Disorderly and Disruptive Conduct in a Restricted Building or

Grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Six); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Eight); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Ten).[2]

On, April 21, 2023, Isaacs was convicted of Altering, Destroying, Mutilating, or Concealing a Record, Document, or Other Object in violation of 18 U.S.C. §§1512(c)(1) and 2 based on a guilty plea entered pursuant to a plea agreement.[3]

## IV.   STATUTORY PENALTIES

Isaacs now faces sentencing on Altering, Destroying, Mutilating, or Concealing a Record, Document, or Other Object in violation of 18 U.S.C. §§1512(c)(1) and 2.

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, Isaacs faces up to 20 years of imprisonment, a term of supervised release of not more than

---

[2] Leslie Gray was charged with the identical offenses in Counts Five, Seven, Nine, and Eleven, except that unlike Isaacs, Grau was charged with Civil Disorder in violation of 18 U.S.C. § 231(a)(3) and Obstruction of an official proceeding in violation of 18 U.S.C. § 1512(c)(2). On June 1, 2023, Leslie Gray pleaded guilty to violating 18 U.S.C. §§ 1512(c)(2) and 2 (Count Three). Gray was sentenced on October 23, 2023 to 12 months a day imprisonment.

[3] On June 16, 2022, the government charged Hallon by Information with Entering and Remaining in a Restricted Building or Grounds, and Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. §§ 1752(a)(1) and (a)(2), and Disorderly Conduct in a Capitol Building and Parading, Demonstrating or Picketing in a Capitol Building, in violation of 40 U.S.C. §§ 5104 (e)(2)(D) and (e)(2)(G).   On December 14, 2022, Hallon pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G). On April 26, 2023, this Court sentenced Hallon to 24 months' probation. *United States v. Luis Hallon,* 22-cr-217.

The government charged William Isaacs with multiple felonies.   On March 20, 2023, a jury found William Isaacs guilty of seven counts, including conspiracy to obstruct an official proceeding in violation of 18 U.S.C. § 1512(k), and obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2). On August 31, 2023, Judge Ahmit P. Mehta sentenced William Isaacs, who suffers from Autism Spectrum Disorder, to 60 months' probation. *United States v. William Isaacs,* 21-cr-0028.

three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

As set forth in the Final PSR, the Guidelines analysis is as follows:

Count Two: 18 U.S.C. § 1512(c)(2)

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference | +3 |
| **Total Offense Level** | | **17** |
| Acceptance of responsibility (U.S.S.G. §3E1.1(a) and (b)) | | -3 |
| **Total Adjusted Offense Level:** | | **14** |

*See* Plea Agreement at ¶¶ 4(A).

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 50. Accordingly, based on the government's calculation of Isaacs' total adjusted offense level, after acceptance of responsibility, at 14, the Guidelines recommended imprisonment range is 15 to 21 months. Isaacs' plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 will be in effect at the time of sentencing in this matter, but was not considered at the time the parties entered into the plea agreement.

14

The Court should not apply § 4C1.1 here for the reason that the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption.   Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions").

Moreover, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack.

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and

the significant need to deter future mob violence, the government submits that even if the Court finds that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[4]

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a term of incarceration.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Isaacs' felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Isaacs immediately realized her criminal conduct on January 6, but instead of owning up to it and accepting responsibility, she went about destroying evidence of her wronging. Further, Isaacs encouraged others to do the same. Her actions evince a total

---

[4] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

disregard for the rule of law and are particularly egregious considering her background as a first responder. Isaacs was aware of the criminality of her actions and took steps designed to obstruct the government's investigation of not only her own criminal conduct, but that of others as well. The nature and circumstances of Isaacs' offense fully support the government's recommended sentence of 18 months' imprisonment.

### B.  The History and Characteristics of the Defendant

Issacs has no criminal history points, a factor already accounted for by the guidelines. She reported to probation that she is currently prescribed Valium (5mg) that she takes as needed due to the stress she feels stemming from the instant criminal charges. PSR ¶66. She has supportive individuals in her life and attends church. Yet nothing in Isaacs' background made her think twice about pushing past police officers, invading the nation's Capital with a mob of rioters, deleting evidence of her crime, and encouraging others to do the same.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Isaacs' criminal conduct on and after January 6 was the epitome of disrespect for the law.

### D.      The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving

domestic terrorism, which the breach of the Capitol certainly was.[5] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a term of incarceration.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.     Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found

---

[5] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range,

differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[6]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[7]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Gray*, 22-cr-338 (DLF), Leslie Gray entered the Restricted Area of the Capitol Grounds, where she unleashed a constant barrage of profanity, name calling, and baseless accusations upon officers working to protect the Capitol. Along with the mob on the

---

[6] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[7] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

east side of the Capitol, Gray then pushed forward past manned barricades and into the Capitol Building. Once inside, Gray continued her unrelenting verbal assault on police officers, calling them traitors and communists, among other things. She claimed the Capitol Building was hers and pushed past police officers who were trying to secure the building. Gray only left when she was physically forced out of the building by a police officer after resisting his verbal commands to leave. This Court sentenced Gray to 12 months' and a day incarceration and 12 months' supervised release. While Gray's conduct on January 6 was substantively different from Isaacs's, Isaac's encouragement of her nephew to participate in the Oath Keeper's actions on January 6 and her additional criminal destruction of evidence in an attempt to obstruct the FBI in their investigation and circumvent punishment fully supports the government's recommendation of 18 months in this case.

In *United States v. Reid*, 22-cr-316, (DLF) the defendant was one of the first rioters to break barricades and surge through police lines on Capitol grounds on January 6th. Reid recorded himself as he and the mob approached the North West Terrace door to the Capitol, stating, "We're storming the fucking Capitol. Promises kept." After entering the Capitol Building, Reid went with rioters through the Crypt and Rotunda, broke police lines inside, and eventually damaged a television and water cooler inside the bathroom next to the Speaker's Lobby. Reid remained inside the Capitol for approximately 30 minutes. In April, after repeatedly posting on social media that he had been at the "front line" during the Capitol breach, FBI agents arrived at Reid's residence to execute arrest and search warrants. After the agents arrived, Reid disabled and hid his cellphone to keep it from use in an official proceeding. Like Isaacs, Reid pleaded guilty to violating 18 U.S.C. § 1512(c)(1), though Reid also pleaded guilty to violating 18 U.S.C.

21

§ 1752(a)(1) and (2), and 40 U.S.C. § 5104(e)(2)(D) and (G). This court sentenced Reid to 37 months' incarceration, 36 months supervised release, and $2,443 restitution.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[8] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Isaacs must pay $2,000 in restitution, which reflects in part the role Isaacs played in the riot on January 6.[9] Plea Agreement at ¶ 11. As the plea agreement reflects,

---

[8] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[9] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Isaacs' restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 33.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 18 months' incarceration, 36 months' supervised release, $2,000 in restitution, and a $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:     */s/ Kyle M. McWaters*
        Kyle M. McWaters
        Assistant United States Attorney
        D.C. Bar No. 241625
        601 D Street NW
        Washington, DC 20003
        (202) 252-6983
        kyle.mcwaters@usdoj.gov